**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NANCY J. PANNEBECKER,
          *Plaintiff-Appellant,*

v.

LIBERTY LIFE ASSURANCE
COMPANY OF BOSTON,
          *Defendant-Appellee.*

No. 06-16654

D.C. No.
CV-01-00825-JAT

OPINION

Appeal from the United States District Court
for the District of Arizona
James A. Teilborg, District Judge, Presiding

Argued and Submitted
June 11, 2008—San Francisco, California

Filed September 18, 2008

Before: M. Margaret McKeown and Ronald M. Gould,
Circuit Judges, and George P. Schiavelli,* District Judge.

Opinion by Judge McKeown

---

*The Honorable George P. Schiavelli, Central District of California, sitting by designation.

13177

**COUNSEL**

Lisa Counters, Kevin Koelbel, Counters & Koelbel, P.C., Chandler, Arizona, for the plaintiff-appellant.

Michael E. Hensley, Eileen Dennis GilBride, Jones, Skelton & Hochuli, P.L.C., Phoenix, Arizona, for the defendant-appellee.

**OPINION**

McKEOWN, Circuit Judge:

In 1996, coronary artery disease forced Nancy Pannebecker to quit her lucrative job as a laboratory and department manager for Hughes Electronics Corporation. Pannebecker began receiving benefits under Hughes's long-term disability plan ("Plan"), which was governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). After paying benefits for over three years, Liberty Life Assurance Company of Boston ("Liberty"), the Plan's administrator, denied continued benefits on the basis that Pannebecker could perform some sedentary work and was therefore not "disabled" under the terms of the Plan.

Pannebecker challenged Liberty's decision in federal court. The district court held that Liberty failed to construe the

Plan's terms correctly, and remanded for compliance with the Plan and identification of specific sedentary occupations for which Pannebecker was suited. On remand, Liberty again concluded that Pannebecker was not disabled. The district court upheld the decision and declined to award reinstatement of benefits following the initial denial and during the remand period.

We agree with the district court's determination that Pannebecker is not "disabled" under the Plan because its terms do not require Liberty to consider either salary remuneration or station in life in making a benefits determination. We reverse, however, the court's decision to deny the reinstatement of benefits, and remand with instructions for the court to reinstate Pannebecker's benefits for the period from Liberty's initial denial in 2000 to its benefits determination in 2005. We also remand for the district court to determine whether Pannebecker is entitled to attorney's fees with respect to the benefits reinstatement.

## BACKGROUND

Pannebecker worked in a variety of technical, managerial, and marketing roles related to the design and development of large-scale computer processing systems. Most recently, she worked as a laboratory and department manager at Hughes, where her annual income was just over $100,000. In 1996, after two cardiac bypass surgeries, she stopped working altogether and sought disability benefits under Hughes's long-term plan.

The Hughes Plan contains two different definitions of "disability," depending on the relevant time frame for which a claim is asserted. Under the "own occupation" benefit, an employee who is "unable to perform all of the material and substantial duties of his occupation on an Active Employment basis because of an Injury or Sickness" is eligible for an initial 18-month benefit. Liberty advised Pannebecker that she

qualified for continued disability benefits under this definition, but that the company would periodically request updated information from her. Near the end of the 18-month period, Liberty pulled Pannebecker's file for audit and determined that she still qualified for "own occupation" benefits.

After the "own occupation" period ends, the Plan defines a "disabled" person as one who is:

> unable to perform, with reasonable continuity, all of the material and substantial duties of his own or any other occupation for which he is or becomes reasonably fitted by training, education, experience, age, and physical and mental capacity.

Invoking this clause, in 2000, Liberty denied Pannebecker continued benefits because she was no longer disabled. Liberty provided a variety of reasons for its decision, including Pannebecker's responses to the Activities Questionnaire, statements by her doctors, the results of video surveillance, and the report of Dr. Conrad, a cardiologist, who determined that there was "no objective evidence that the patient would be unable to perform work involving sedentary activity." Pannebecker sought review of the denial of benefits, and Liberty commissioned a follow-up review by Dr. Conrad, who concluded that although Pannebecker's ability to work might be affected by angina and other symptoms of heart disease, there was "no objective evidence . . . of a functional impairment due to heart disease that would render her unable to perform sedentary work." Liberty denied Pannebecker's request for review.

Pannebecker then filed a complaint in the district court under 29 U.S.C. § 1132(a)(1). The court reviewed Liberty's decision de novo because an inherent conflict of interest existed, as Liberty was the Plan's administrator and insurer. The court found that despite "ample evidence in support of Defendant's conclusion that Plaintiff was able to perform

some unnamed 'sedentary' job, more is needed to evaluate Defendant's decision." Because Liberty had not offered any specific sedentary position for which Pannebecker was reasonably fitted by the Plan's stated criteria, i.e., training, education, experience, age, and physical and mental capacity, Liberty "failed to make a reasonable inquiry into the type of skills Plaintiff possesses and whether those skills may be used at another job," and "failed to properly apply the Plan provisions." The court remanded for Liberty to determine the types of sedentary positions, if any, for which Pannebecker was reasonably fitted based on the Plan's criteria. In a separate order, the court denied attorney's fees.

On remand, Liberty retained a vocational consultant, Jacqueline Kurth, who concluded that, given Pannebecker's background, work history, and current physical capabilities, she could perform a variety of sedentary occupations, such as customer service representative, information clerk, receptionist, data entry keyer, and general office clerk. After Liberty filed Kurth's report with the district court, Pannebecker retained Lisa Clapp, a vocational consultant, to perform an employability assessment. In Clapp's view, Pannebecker was totally disabled. She criticized Kurth's report because Kurth failed to conduct labor market research and did not call local employers to gauge their interest in someone like Pannebecker. Kurth followed up with a second report in which she reaffirmed that Pannebecker was reasonably fitted for several sedentary occupations. Liberty then notified Pannebecker that it declined to alter its benefits determination.

Pannebecker moved for judgment under Federal Rule of Civil Procedure 52(c), and Liberty filed a motion for summary judgment.[1] The district court, reviewing Liberty's deci-

---

[1]Liberty acknowledged to the district court that it should have moved for judgment under Rule 52, and not summary judgment, because of the existence of a genuine issue of material fact. On this basis, the court denied Liberty's motion.

sion de novo, upheld the denial of benefits. According to the court, Pannebecker was not disabled under the terms of the Plan because she was able to perform the duties of other occupations that Kurth had identified as reasonably fitted to her by virtue of her training, education, experience, age, and physical and mental capacity. The court rejected Pannebecker's claim for retroactive benefits.

## STANDARD OF REVIEW

We review de novo the district court's choice and application of the standard of review to decisions by ERISA fiduciaries, and we review for clear error its underlying findings of fact. *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 962 (9th Cir. 2006) (en banc). At the time of its ruling, the district court did not have the benefit of *Abatie*, which clarified the standard of review.[2] Operating under the framework of our previous precedent in *Atwood v. Newmont Gold Co., Inc.*, 45 F.3d 1317 (9th Cir. 1995), the court found that because Liberty was both the Plan's administrator and insurer, an inherent conflict of interest existed. The court also concluded that, because Pannebecker presented "material, probative evidence," an inherent conflict of interest tainted Liberty's decision.[3] Consequently, a presumption arose in Pannebecker's favor that Liberty failed to rebut.

*Atwood* was overruled by an en banc panel of this court in *Abatie*, which applied an abuse of discretion standard to review decisions of a discretion-granting plan, even if the administrator has a conflict of interest. 458 F.3d at 965. The

---

[2]In 2004, the district court conducted a conflict-of-interest analysis and concluded that de novo review was appropriate under *Atwood*. When it issued its Rule 52(c) judgment on August 16, 2006, it incorporated this earlier conclusion. *Abatie* had been filed the previous day, and was not yet widely circulated.

[3]The "material, probative evidence" that Pannebecker presented was that Liberty required "objective" evidence of her disability, even though the Plan's definition of "disability" did not mention such a requirement.

Plan here was a discretion-granting one, as it stated that Liberty "shall possess the authority, in its *sole* discretion, to construe the terms of this policy and to determine benefit eligibility thereunder." (emphasis added). *See id.* (stating that a plan that bestows on the administrator the sole "responsibility to interpret the terms of the plan *and* to determine eligibility for benefits" is a discretion-granting one).

*Abatie* thus bound the district court to review Liberty's decision for abuse of discretion. In evaluating whether an abuse of discretion occurred, the court should make "something akin to a credibility determination about the insurance company's or plan administrator's reason for denying coverage[,]" and adjust its level of skepticism in proportion to its evaluation of the conflict of interest. *Id.* at 969.

Despite the "ships passing in the night" timing of the *Abatie* decision, the district court's evaluation of disability resulted in no error. The court reviewed Liberty's decision de novo, which is a more rigorous standard than the "informed" abuse of discretion review that *Abatie* requires. *Id.* at 965-74. That the court affirmed Liberty's denial without giving any deference to Liberty's decision makes it unlikely that on remand, the court would find, under a standard friendlier to Liberty, that Liberty abused its discretion. We do not read *Abatie* or our cases interpreting it to require a different result. *See Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 868-69 (9th Cir. 2008) (explaining that courts should discount deference based on conflicts of interest "to overcome the 'serious . . . danger of conflicted plan decision-making' " (citation omitted)).

## Analysis

Pannebecker challenges Liberty's benefits decision primarily on the ground that Liberty failed to consider salary remuneration in finding that she was qualified for certain entry-

level positions. She also disputes the court's denial of retroactive reinstatement of benefits and attorney's fees.

## I.  DISABILITY UNDER THE PLAN

[1] We begin our evaluation of Liberty's benefits denial with the governing plan documents. *See Metro. Life Ins. Co. v. Parker*, 436 F.3d 1109, 1113 (9th Cir. 2006). Liberty was required to benchmark Pannebecker's eligibility for benefits against the Plan definition of "disabled," i.e., "unable to perform, with reasonable continuity, all of the material and substantial duties of his own *or any other occupation* for which he is or becomes reasonably fitted by training, education, experience, age, and physical and mental capacity." (emphasis added). *See Saffle v. Sierra Pac. Power Co. Bargaining Unit Long Term Disability Income Plan*, 85 F.3d 455, 458 (9th Cir. 1996) (stating that a plan administrator "abuses its discretion if it construes provisions of the plan in a way that 'conflicts with the plain language of the plan' " (citations omitted)).

[2] The record supports Liberty's conclusion that Pannebecker was able to perform the duties of other occupations for which she was reasonably fitted by the Plan's stated criteria. One of Pannebecker's doctors noted in 2000 that she was "doing well," had been maintaining an active lifestyle, and was subjectively asymptomatic. Pannebecker stated in her Activities Questionnaire that she exercised a few times a week, could sit indefinitely and stand for 15 minutes at a time, went grocery shopping and did limited mall shopping. The video surveillance depicted Pannebecker shopping, driving, carrying purchased items, walking limited distances, and eating out with friends. Dr. Conrad concluded that Pannebecker had "reasonably good functional capacity, with stable angina, and is able to perform normal activities, including exercise." Kurth studied and discussed Pannebecker's extensive medical history, noting that despite suffering from severe angina in 2001, she recently reported feeling "absolutely great," and "like 'a miracle.' " Kurth found that Pannebecker had trans-

ferable work skills that included the ability to coordinate others, analyze and compute data, and present information in a clear and articulate manner. Pannebecker felt that managing people, working under deadlines, and meeting customer expectations were "stressful" activities, so Kurth, balancing these considerations, suggested a range of sedentary jobs, from customer service representative, to information clerk, receptionist, data entry keyer, and general office clerk, as being within Pannebecker's transferable work skills. This evidence supports Liberty's determination that Pannebecker was reasonably fitted for some sedentary positions.[4]

Although the Plan does not require Liberty to consider a claimant's current salary or station in life in making a disability determination, Pannebecker asks us to import those qualifications into the Plan's terms. We decline to do so.

[3] As we observed in *McKenzie v. General Telephone Co. of California*, the "language of the 'any occupation' standard is not demanding." 41 F.3d 1310, 1317 (9th Cir. 1994), *overruled on other grounds by Saffon*, 522 F.3d at 872 n.2. The plan in *McKenzie* provided that a person was "disabled" if he was "completely unable to engage in any and every duty pertaining to any occupation or employment for wage or profit for which you are or become reasonably qualified by training, education or experience." *Id.* at 1313 n.2. We interpreted that language to mean what it said: a claimant was not disabled if he could perform any job for which he was qualified by training, education, or experience. *See id.* at 1317. Here, the Plan's

---

[4]Pannebecker's challenges to Kurth's report do not alter this conclusion. Although not extensive, Kurth's mention of Pannebecker's age and brief discussion of her mental state and need to avoid stress indicate that these considerations were not ignored. Similarly, Clapp's criticisms and methodology do not undermine Kurth's report. The Plan's definition of "disability" does not require Liberty to identify a specific employer for Pannebecker. Nor is there any compelling evidence that the labor market research performed by Clapp was preferable to Kurth's transferable skills analysis.

"any other occupation" language similarly sets out the criteria by which Liberty is to judge whether a claimant is disabled. As in *McKenzie*, sufficient evidence showed that Pannebecker could perform other occupations for which she was reasonably fitted by virtue of these criteria.

Despite the broad reach of the Plan's "any other occupation" language, Pannebecker seizes on a reference in *Madden v. ITT Long Term Disability Plan for Salaried Employees*, 914 F.2d 1279 (9th Cir. 1990), to support her claim that we should impose a salary remuneration requirement. We were asked in *Madden* to consider *Helms v. Monsanto Co. Inc.*, 728 F.2d 1416 (11th Cir. 1984), in which the plan defined total or permanent disability to mean disabled "by reason of bodily injury or disease so as to be prevented thereby from engaging in any occupation or employment for remuneration or profit[.]" *Helms*, 728 F.2d at 1418. The Eleventh Circuit interpreted that plan's definition of "disabled" to require a "physical inability to follow any occupation from which [one] could earn a reasonably substantial income rising to the dignity of an income or livelihood, even though the income is not as much as he earned before the disability." *Id.* at 1421-22.

**[4]** In contrast, the plan we examined in *Madden* defined "disabled" as "unable to engage in *any* occupation for which [he is] qualified, based on [his] training, education, or experience." 914 F.2d at 1285. Pannebecker hangs her hat on our statement in *Madden* that that plan's definition of "disability," "which recognize[d] a claimant's personal training, education, and experience, favor[ed] a claimant far more than Madden's proposed *Helms* definition, which merely focused on the likelihood of a 'reasonably substantial income' that 'approach[es] the dignity of a livelihood.' " *Id.* at 1285-86 (last alteration appears in original). Pannebecker takes this language to mean that, as a categorical rule, an administrator must consider salary remuneration as a threshold consideration, with "training, education, or experience" as the next step up in requirements that a claimant must meet to be not "disabled." But Panne-

becker's reading of *Madden* is incomplete. In stating that the *Madden* plan's "disability" definition was more favorable to claimants than the plan in *Helms*, we were simply making the observation that the number of jobs for which a person is qualified when considering one's personal training, education, or experience, is less than the number of jobs that have a "reasonably substantial income" that "approach[es] the dignity of a livelihood." *Id.* In other words, a plan that incorporates "training, education, or experience" requires some individuation in the analysis. But we were not, in *Madden*, importing into every ERISA plan a definition of "disability" that considers a claimant's most recent salary or station in life.

**[5]** The Plan here required only that Pannebecker be able to perform the duties of any occupation for which she was reasonably fitted by training, education, experience, age, and physical and mental capacity. Given the Plan's plain terms, Liberty did not abuse its discretion in failing to consider Pannebecker's most recent salary or station in life in its benefits determination.[5] *See Richardson v. Pension Plan of Bethlehem Steel Corp.*, 112 F.3d 982, 985 (9th Cir. 1997) (stating that when the parties dispute the interpretation of an ERISA plan, " 'courts should first look to explicit language of the agreement to determine, if possible, the clear intent of the parties' " (quoting *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1293) (6th Cir. 1991))).

---

[5]Pannebecker gestures to Liberty's Policies Procedures and Exceptions for "any occ" evaluations ("PP&E"), which indicate that Liberty should consider "reasonable replacement of income based on TEE [training, education, and experience]." Liberty presented evidence that the PP&E are not hard and fast rules applied in every case. Pannebecker also cites Liberty's "rehabilitation employment benefit," which allows claimants in approved positions to continue receiving benefits until they earn 20% of their pre-disability earnings. We agree with the district court's conclusions that these references "cannot reasonably be read to modify the [Plan's] definitions of disabled, and furthermore, Plaintiff has made no showing that she has attempted to avail herself of such a benefit."

Pannebecker's remaining challenges, including a variety of alleged procedural deficiencies, have no legal traction or were not raised before the district court.

## II.   REINSTATEMENT OF BENEFITS

The district court concluded in 2004 that Liberty "failed to properly apply the Plan provisions" and "failed to make a reasonable inquiry into the type of skills Plaintiff possesses and whether those skills may be used at another job," but denied the retroactive reinstatement of benefits. We review for abuse of discretion the district court's denial of reinstatement of benefits. *See Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1163 (9th Cir. 2001).

[6] As the Seventh Circuit has recognized, the ERISA claimant whose initial application for benefits has been wrongfully denied is entitled to a different remedy than the claimant whose benefits have been terminated. *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 775-76 (7th Cir. 2003). Where an administrator's initial denial of benefits is premised on a failure to apply plan provisions properly, we remand to the administrator to apply the terms correctly in the first instance. *See Saffle*, 85 F.3d at 460-61 (ordering remand where an ERISA administrator "misconstrued the Plan and applied a wrong standard to a benefits determination").[6] But if an administrator terminates continuing benefits as a result of arbitrary and capricious conduct, the

---

[6]Our decision in *Patterson v. Hughes Aircraft Co.*, 11 F.3d 948 (9th Cir. 1993), is not to the contrary. Patterson was deemed disabled by his plan's administrator and received benefits for two years, until they were abruptly terminated. *Id.* at 949. His plan explicitly limited the payment of benefits to only two years if he suffered from a "mental, nervous, or emotional disorder[ ]." So, Patterson's benefits were scheduled to terminate unless it was established that he did not suffer from such a disorder. Reinstating benefits while remanding for the administrator to determine the nature of his disability could have resulted in a windfall to Patterson if it were later determined that his disability was caused by a mental disorder.

claimant should continue receiving benefits until the administrator properly applies the plan's provisions. *See Grosz-Salomon*, 237 F.3d at 1163 (stating that benefits should be reinstated where "but for [the insurer's] arbitrary and capricious conduct, [the insured] would have continued to receive the benefits" (internal quotation marks and citation omitted)). This distinction in remedies "makes perfect sense[,]" as the improper termination in the latter case was "the result of arbitrary and capricious procedures, and therefore [ ] benefits could not have been terminated by those procedures." *Hackett*, 315 F.3d at 776.

**[7]** Liberty distinguishes *Hackett* on the basis that the administrator in *Hackett* terminated benefits as a result of defective procedures, which is not the case before us. But, whether the administrator abused its discretion because the decision was substantively arbitrary or capricious, or because it failed to comply with required procedures, benefits may still be reinstated if the claimant would have continued receiving benefits absent the administrator's arbitrary and capricious conduct. As we have noted, in the ERISA world, "no great wall divides procedural from substantive violations." *Blau v. Del Monte Corp.*, 748 F.2d 1348, 1353 (9th Cir. 1984).

**[8]** Pannebecker was already receiving benefits, and, but for Liberty's arbitrary and capricious conduct—i.e., its failure to apply the terms of the Plan properly—she would have continued receiving them. While Liberty was given a second opportunity to determine whether Pannebecker was "disabled" under the Plan, that second chance should not have left Pannebecker empty-handed during the time that it took Liberty to comply with the Plan's requirements. The district court should have awarded Pannebecker benefits from the time of Liberty's improper denial in 2000 until the company's decision of May 3, 2005, to decline to alter its benefits determination.

## III.  ATTORNEY'S FEES

**[9]** In an ERISA action, a court in its discretion may allow reasonable attorney's fees and costs to either party. 29 U.S.C. § 1132(g)(1). The district court denied Pannebecker's request for attorney's fees on the basis that she failed to establish a right to benefits. As a result of this appeal, however, Pannebecker is entitled to have her benefits reinstated for the short period following the court's initial remand. Because she achieved some of the benefit that she sought in bringing suit, we remand for the court to determine, in its discretion, whether Pannebecker is entitled to reasonable attorney's fees and costs.

We affirm the court's Rule 52(c) judgment in favor of Liberty, on the basis that Pannebecker was not disabled under the Plan. We reverse the denial of reinstatement of benefits, and remand for consideration of attorney's fees with respect to the benefits reinstatement.

**AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**Each party to pay its own costs on appeal**.