**Donald J. KURTH, Plaintiff,**

v.

**HARTFORD LIFE AND ACCIDENT INSURANCE CO., Defendant.**

Case No. 2:10–cv–01229–JHN–DTBx.

United States District Court,
C.D. California.

Feb. 27, 2012.

Glenn R. Kantor, Niamh E. Doherty, Kantor and Kantor LLP, Northridge, CA, for Plaintiff.

Daniel W. MaGuire, Burke Williams & Sorensen LLP, Los Angeles, CA, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACQUELINE H. NGUYEN, District Judge.

### I. INTRODUCTION

█ This is an action for benefits pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, brought by Plaintiff Donald J. Kurth, M.D. ("Plaintiff") against Defendant Hartford Life and Accident Insurance Co. ("Defendant"). The suit stems from Defendant's alleged failure to conduct a full and fair review of Plaintiff's disability claim. On August 9, 2011, the Court held a bench trial. One of the key issues was whether Defendant erred in failing to conduct an independent medical evaluation ("IME"), such that, at a minimum, the matter must be remanded for further consideration.[1] Plaintiff posits that Defendant abused its discretion in denying Plaintiff's claim because, while an IME was *not* required, Defendant could have easily requested one.[2] Plaintiff further asserts that, while Defendant has discretion in eligibility determinations, it is a conflicted fiduciary. Thus, Plaintiff's argument goes, the abuse of discretion standard

must be tempered.[3] Defendant counters that Defendant, as claims administrator, has *no* obligation to conduct an IME and, in any event, an IME would be meaningless because Plaintiff's heart condition is subject to objective testing.[4]

Having considered the evidence presented at the trial and the parties' briefs, the Court now makes the following findings of fact and conclusions of law.[5] The Court finds in favor of Plaintiff and remands the matter.

### II. PROCEDURAL HISTORY

Plaintiff commenced this action on February 18, 2011, invoking diversity jurisdiction, 28 U.S.C. § 1332.[6] The Complaint alleges claims for breach of contract and breach of covenant of good faith and fair dealing. On July 12, 2010, the Court allowed the parties to brief whether the matter should proceed as an ERISA case.[7] On September 27, 2010, the parties stipulated, *inter alia*, that the bad faith claim be dismissed with prejudice; the breach of contract claim be converted into an ERISA claim under 29 U.S.C. § 1132(a)(1)(B); and Plaintiff's jury demand be stricken.[8] The Court approved the parties' stipulation.

On May 3, 2011, Plaintiff filed a "Request to Conduct a Pre-trial 'Nolan Hearing' to Consider Extrinsic Evidence Rele-

---

**1.** Remand for reevaluation of the merits of a claim is warranted in circumstances where "an ERISA plan administrator, with discretion to apply a plan, misconstrued the Plan and applied a wrong standard to a benefits determination." *Saffle v. Sierra Pac. Power Co. Bargaining Unit Long Term Disability Income Plan,* 85 F.3d 455, 461 (9th Cir.1996).

**2.** 8/9/11 Tr. 48:22–25.

**3.** 8/9/11 Tr. 16:3–4.

**4.** 8/9/11 Tr. 43:9–11.

**5.** To the extent any findings of fact may be deemed conclusions of law, they shall also be considered conclusions. Similarly, to the extent any conclusions as stated may be deemed findings of fact, they shall also be considered findings.

**6.** Docket No. 1.

**7.** Docket No. 11.

**8.** Docket No. 17.

vant to Defendant's Structural And Actual Financial Bias." [9] Defendant filed an opposition and Plaintiff filed a reply.[10] The Court then held a bench trial. The Court allowed the parties to present evidence as to Defendant's structural conflict of interest.[11]

### III. FINDINGS OF FACT[12]

▆▆▆▆ "In bench trials, Fed.R.Civ.P. 52(a) requires a court to 'find the facts specially and state separately its conclusions of law thereon.'" *Vance v. American Hawaii Cruises, Inc.*, 789 F.2d 790, 792 (9th Cir.1986) (quoting Fed.R.Civ.P. 52(a)). "One purpose behind Rule 52(a) is to aid the appellate court's understanding of the basis of the trial court's decision. This purpose is achieved if the district court's findings are sufficient to indicate the factual basis for its ultimate conclusions." *Id.* (citations omitted). Furthermore, the court "is not required to base its findings on each and every fact presented at trial." *Id.* at 792. The following constitutes the findings of fact based on the Administrative Record ("A.R.") and extrinsic evidence. The Administrative Record in this matter consists of documents stamped "H0001–1719." [13]

### A. Plaintiff's Occupation and Job Duties

Plaintiff was employed by the Faculty Physicians and Surgeons of Loma Linda University School of Medicine ("Loma Linda").[14] He was hired in 1997 and worked as a Psychiatrist and Addictionist or Addiction Medicine Physician.[15] According to Loma Linda, Plaintiff's job description was his employee contract, and there were no written specific job duties for him as an Addiction Medicine Physician.[16] Plaintiff provided group counseling and was specifically employed by the psychiatry department.[17] Plaintiff performed chemical dependency patient care from Monday through Friday. Additionally, Plaintiff covered chemical dependency calls from Monday through Friday, 24 hours a day, five days a week.[18] The physical aspects of Plaintiff's job included frequent standing and walking, occasional sitting, stooping, kneeling and crouching.[19]

In addition to his employment with Loma Linda, at the time Plaintiff applied

9. Docket No. 30.

10. Docket Nos. 35 & 40, *respectively*.

11. 8/9/11 Tr. 4:2–6.

12. Defendant filed evidentiary objections to Plaintiff's exhibits in support of his Request for a *Nolan* Hearing, and Plaintiff filed a response. (Docket Nos. 36 & 40, *respectively*.) As to the deposition transcripts of Bruce Luddy and Jonathan Strang, these transcripts are properly authenticated. (Docket No. 40, Exhs. A–1, B–1.) The Court overrules Defendant's hearsay objections because evidence that is necessary to conduct an ERISA review "need not satisfy the strict rules for the admissibility of evidence in a civil trial, and may be considered so long as it is relevant, probative, and bears a satisfactory indicia of reliability." *Tremain v. Bell Indus.*, 196 F.3d 970, 978 (9th Cir.1999). The Court also overrules the objection to the Interrogatory Responses

in *Ahmad v. Hartford,* since Plaintiff has submitted a declaration to properly authenticate the evidence. (Docket No. 40–1, Exh. C–1.) Lastly, the Court need not address Defendant's objection to Exhibit F as that evidence has no bearing on the disposition of this claim.

13. Docket Nos. 25–29.

14. A.R. H1220.

15. A.R. H0200, 1220, 1222, 0024.

16. A.R. H0024.

17. A.R. H0024.

18. A.R. H1237.

19. A.R. H1221.

for Long Term Disability ("LTD") benefits in July 2007, he was also the Mayor of Rancho Cucamonga, a position he has held since 2006, and his duties included "attending a three hour council meeting every other week."[20] Plaintiff also owned and oversaw various medical facilities.[21]

## B. Plaintiff's LTD Coverage

The Policy confers upon Defendant "full discretion and authority to determine eligibility for benefits."[22] Benefits are payable to the insured only upon submission of proof of loss to Defendant.[23] Under the Policy, Defendant reserves the right to require the insured to be examined by a physician, vocational expert, functional expert, or other professionals.[24]

The pertinent sections of Dr. Kurth's Policy provide:

**Disability or Disabled** means You are prevented from performing one or more of the Essential Duties of: 1) Your Occupation, during the Elimination Period; and 2) Your Occupation, following the Elimination Period, and as a result Your Current Monthly Earnings are less than 80% of Your Indexed Pre-disability Earnings.[25]

For physicians, the coverage further provides:

**Your Occupation** means the general or sub-specialty in which You are practicing for which there is a specialty or sub-specialty recognized by the American Board of Medical Specialties. If the sub-specialty in which You are practicing is not recognized by the American Board of Medical Specialties, You will be considered practicing in the general specialty category.[26]

"Essential Duty" is defined by the Policy as "a duty that (1) is substantial, not incidental; (2) is fundamental or inherent to the occupation; and (3) cannot be reasonably omitted or changed."[27]

## C. Plaintiff's Claim & Defendant's Denials

Plaintiff left work on June 1, 2007 "due to acute myocardial infarction and severe coronary artery disease."[28] On June 3, 2007, Defendant determined that Plaintiff was "Disabled" and was entitled to benefits beginning on September 1, 2007.[29] Thereafter, on June 4, 2007, Plaintiff underwent a quintuple bypass surgery at San Antonio Community Hospital.[30]

Plaintiff was paid short term disability insurance benefits, but was originally denied LTD benefits.[31] In its initial denial letter, dated October 31, 2007, Defendant concluded that Plaintiff was not entitled to LTD benefits because he failed to show that he was unable to perform the essential duties of his occupation as required by the Policy.[32] Thereafter, upon review of Plaintiff's complaints to Dr. Patadia, Defendant determined that Plaintiff was enti-

---

20. A.R. H0071; H0202.

21. A.R. H0072.

22. A.R. H1673.

23. A.R. H1664.

24. A.R. H1670.

25. A.R. H1674.

26. A.R. H1678.

27. A.R. H1675.

28. A.R. H1223; H0071.

29. A.R. H0071.

30. A.R. H1223.

31. Pl.'s Opening Trial Br. at 6.

32. A.R. H1061.

tled to receive LTD for the period of September 1, 2007 through January 6, 2008.[33]

Defendant continued paying Plaintiff LTD benefits until February 20, 2009, when, for the *second* time, it denied the payments of LTD benefits.[34] By a letter from Hartford Investigative Specialist Theresa T. McGagin (hereinafter, "2/20/2009 Denial Letter"), Defendant notified Plaintiff that he no longer satisfied the definition of disability under the Policy.[35] Defendant explained that as part of its claims management and to determine Plaintiff's current level of functionality, Defendant conducted a surveillance investigation performed on May 28 and 29, 2008 and again on June 28 and 29, 2008.[36] During the surveillance, Plaintiff was documented engaging in physical activities, including walking, standing, driving, sawing a piece of wood, and carrying shopping bags.[37] The 2/20/2009 Denial Letter also recounted that on September 17, 2008, Defendant sent Kenneth Tingley ("Tingley"), a Hartford investigator, to Plaintiff's residence, and during a 4–hour interview, Plaintiff was observed walking and moving and denied pain.[38] During the interview, Plaintiff reported his "inability to keep up with the physical and cognitive pace and demands of [his] job."[39] However, Plaintiff also reported at the interview that he received a Master of Business Administration ("MBA") from Loma Linda University in August 2007 and a Master of Public Administration ("MPA") from Harvard University in June 2008.[40]

On January 22, 2009, Defendant forwarded a copy of the in-person statement made by Plaintiff to Tingley and the reports and surveillance videos to Dr. Patadia, Plaintiff's cardiologist.[41] On February 3, 2009, Dr. Patadia reported that "he did not wish to be involved or did not want to respond" to Defendant's inquiry.[42] Thereafter, Plaintiff's information was referred to MES Solutions ("MES") for a paper review.[43] On February 17, 2009, Mark J. Friedman, M.D. ("Dr. Friedman") finalized his review of Plaintiff's medical records.[44] Dr. Friedman opined that Plaintiff "should be capable of a light level of work."[45]

Based on the foregoing information, Defendant concluded that Plaintiff has "demonstrated a significant degree of cognitive and psychological functioning and stress tolerance based on [his] ability to complete an MBA, MPA, operate and oversee operations of various companies, and maintain the office of Mayor of Rancho Cucamonga while being on disability."[46] Defendant concluded that Plaintiff is capable of performing sedentary and light work on a full time basis.[47] Defendant's payment of LTD benefits to Plaintiff ceased effective February 20, 2009.

33. A.R. H0040.

34. Pl.'s Opening Trial Br. at 6.

35. A.R. H0069.

36. A.R. H0071.

37. A.R. H0071; H0911–0922.

38. A.R. H0071.

39. A.R. H0071.

40. A.R. H0071.

41. A.R. H0072.

42. A.R. H0072; H0016.

43. A.R. H0072.

44. A.R. H0072.

45. A.R. H0821.

46. A.R. H0073.

47. A.R. H0073.

### D. Plaintiff's Appeal & Defendant's Review

In September 2009, Plaintiff appealed Hartford's decision to terminate Plaintiff's LTD benefits.[48] Included with Plaintiff's request for reconsideration were several exhibits, including medical records.[49]

In a letter dated December 8, 2009 (hereinafter, "12/28/2009 Denial Letter"), Hartford Appeal Specialist Chris B. Davis ("Davis") notified Plaintiff that his appeal was denied. Davis explained that in interpreting Plaintiff's occupational responsibilities, Defendant consulted with Loma Linda and The American Society of Addiction Medicine ("ASAM") to obtain their input on the requirements of an Addictionist.[50] Davis noted that, in contrast, Plaintiff did not provide any information from a qualified vocational expert to suggest that Defendant's interpretation of Plaintiff's occupational responsibilities was inaccurate.[51]

Davis also disagreed with Plaintiff's contention that the determination of whether his disability prevented him from one or more "essential duties of his occupation" should be done without regard to his extra curricular activities and accomplishments.[52]

To obtain a comprehensive evaluation, Defendant sent Plaintiff's medical documentation obtained during the original claim investigation process and appeal to UDC. Defendant also forwarded to UDC copies of the surveillance evidence.[53] UDC assigned the claim to Philip Portrid, M.D., a cardiologist, and Cris Johnston, Ph.D., a neuropsychologist.[54]

Dr. Portrid concluded that "there was no evidence for any heart failure" and opined that "there was no evidence showing that Plaintiff's use of prescription drugs warrants any additional restrictions or limitations." [55] Based on Dr. Portrid's review, Defendant determined that Plaintiff was capable of performing up to medium physical-demand-level work with certain restrictions or limitations.[56]

With regard to Plaintiff's cognitive complaints, Dr. Johnston observed that while Plaintiff indicated that he has problems with cognitive functioning, Plaintiff did not report these concerns to his treating providers, nor has he taken initiative in seeking assessment or treatment for such symptoms. For these reasons, Dr. Johnston concluded that the need for restrictions or limitations to Plaintiff's psychological/cognitive functioning is not supported by information available for his review.[57] Based on Dr. Johnston's Neuropsychological Record Review, Defendant determined that there is insufficient evidence to support the need for restrictions and limitations attributed to Dr. Kurth's cognitive complaints.[58]

## IV. STANDARD OF REVIEW AND BURDEN OF PROOF

■ "Where an ERISA plan confers discretionary authority upon a plan administrator to determine eligibility for benefits, [courts] generally review the administrator's decision to deny benefits for an

---

48. Pl.'s Opening Trial Br. at 8; A.R. H0228.

49. A.R. H0201.

50. A.R. H0201.

51. A.R. H0201.

52. A.R. H0202.

53. A.R. H0202.

54. A.R. H0203.

55. A.R. H0203–204.

56. A.R. H0204.

57. A.R. H0205.

58. A.R. H0206.

abuse of discretion." *Nolan v. Heald College*, 551 F.3d 1148, 1153 (9th Cir.2009); *see also, Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir.2006).

■ However, it is undisputed in this case that Defendant operates under a "structural conflict of interest"[59] as an entity that both determines eligibility for benefits and pays benefits awards.[60] Under these circumstances, "[s]imply construing the terms of the underlying plan and scanning the record for medical evidence supporting the plan administrator's decision is not enough, because a reviewing court must take into account the administrator's conflict of interest as a factor in the analysis." *Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623, 630 (9th Cir.2009). The Court must "weigh the conflict 'as a factor in determining whether there is an abuse of discretion.'" *Nolan*, 551 F.3d at 1153 (quoting *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008)); *cf., Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 674 (9th Cir.2011) (stating that while the conflict of interest must be "weighed as a factor," it does not convert abuse of discretion review into *de novo* review).

■ "[W]eighing a conflict of interest as a factor in abuse of discretion review requires a case-by-case balance." *Abatie*, 458 F.3d at 968; *see also, Montour*, 588 F.3d at 630 ("The weight the court assigns to the conflict factor depends on the facts and circumstances of each particular case."). As the Ninth Circuit instructs:

A district court, when faced with all the facts and circumstances, must decide in each case how much or how little to credit the plan administrator's reason for denying insurance coverage. An egregious conflict may weigh more heavily (that is, may cause the court to find an abuse of discretion more readily) than a minor, technical conflict might. But in any given case, all the facts and circumstances must be considered.... *Abatie*, 458 F.3d at 968. The significance of a conflict may be low in instances where there is no evidence of "malice, self dealing, or of a parsimonious claims-granting history." *Id.* at 968. However, the "court may weigh a conflict more heavily if, for example, [1] the administrator provides inconsistent reasons for denial; [2] fails adequately to investigate a claim or ask the plaintiff for necessary evidence; [3] fails to credit a claimant's reliable evidence; or [4] has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record." *Id.* at 968–969 (internal citations omitted). The court "must determine the extent to which the conflict influenced the administrator's decision and discount to that extent the deference" the court accords to the administrator's decision. *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 868 (9th Cir. 2008). Further, the Court may consider extrinsic evidence outside the administrative record to determine "the conflict's 'nature, extent, and effect on the decision-making process.'" *Nolan*, 551 F.3d at 1153 (citations omitted).

## V. CONCLUSIONS OF LAW

### A. Application of Abuse of Discretion with Enhanced Skepticism

Defendant acknowledges that a structur-

---

**59.** *See Abatie*, 458 F.3d at 965 ("'[A]n insurer that acts as both the plan administrator and the funding source for benefits operates under what may be termed a structural conflict of interest.'").

**60.** 8/9/11 Tr. 10:24–11:1.

al conflict exists.[61] Therefore, "the Court must weigh the conflict as a factor in determining whether there is an abuse of discretion." *Abatie*, 458 F.3d at 965.

### 1. Weighing the Conflict Heavily in this Case is Appropriate

■ A court may weigh a conflict more heavily if the administrator failed to adequately investigate a claim or ask the plaintiff for necessary evidence. *Id.* at 968 (citing *Booton v. Lockheed Med. Benefit Plan*, 110 F.3d 1461, 1463–64 (9th Cir. 1997)). Having considered the administrative record and the extrinsic evidence presented, the Court finds that it must assign significant weight to the conflict because it tainted much of the administrative decision-making process.

■ Preliminarily, the nature of Defendant's relationship with the vendors and their reviewing physicians creates an incentive for the vendors to reach results that are favorable to Defendant in order to foster and sustain their business relationship.[62] *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003) (citing with approval the lower court's observation that "physicians repeatedly retained by benefits plans may have an incentive to make a finding of 'not disabled' in order to save their employers money and to preserve their own consulting arrangements"); *Rabuck v. Hartford Life & Accident Ins. Co.*, 522 F.Supp.2d 844, 873 (W.D.Mich.2007) (observing that UDC has supplied Hartford with opinions in other cases supporting Hartford's decisions denying LTD benefits.) Defendant referred Plaintiff's claim to MES and UDC for cardiac and psychological evaluations.[63] Defendant cannot, and does not, dispute its long, well-established relationship with these two vendors.[64] Plaintiff has submitted evidence showing that, since 2002, when Defendant and UDC first entered into a contractual relationship, there has been a "gradual increase" of claims referred by Defendant to UDC.[65] From the end of 2004 to February 2006, Defendant referred to UDC an average of 200 to 250 claims per month.[66] As of February 2006, UDC derived 70 to 75 percent of its overall revenue from Defendant.[67] From 2007 to 2009, the year when Plaintiff's benefits were terminated, Defendant's referrals to MES increased from 673 to 1,496 claims, and the amount billed by MES for these referrals almost tripled from about $0.5 million in 2007 to roughly $1.5 million in $2009.[68]

61. 8/9/11 Tr. 10:24–11:1.

62. Defendant Hartford and UDC's symbiotic relationship was noted in *Caplan v. CNA Fin. Corp.*, 544 F.Supp.2d 984, 989–990 (N.D.Cal. 2008). Citing the administrative record, the court finds that as of February 2006,

> close to seventy-five percent of UDC's revenue was derived from Hartford. UDC initially charged $300 per hour for its physicians to review disability files, but its hourly charge to Hartford under a 2002 contract was reduced to $225 per hour in what UDC owner Jonathan Strang described as a "volume discount type arrangement." UDC's gross revenue increased between fifty and one hundred percent from 2002 to 2004 after it signed its contract with Hartford. Since 2002, Hartford has paid UDC more than thirteen million dollars for review services.
>
> *Id.* at 989–990.

63. Docket No. 30 at 6.

64. 8/9/11 Tr. 11:14–19.

65. Kantor Decl., Ex. B, Strang Dep. Tr., 42:9–15 [Docket 30–2.].

66. Kantor Decl., Ex. B, Strang Dep. Tr., 42:13–20.

67. Kantor Decl., Ex. B, Strang Dep. Tr., 43:13–20.

68. Kantor Decl., Ex. C at 12.

While Plaintiff has not presented direct evidence showing that Defendant's financial interests and bias caused the termination of his benefits, it can be reasonably inferred that "Hartford's bias infiltrated the entire administrative decision-making process." *Montour*, 588 F.3d at 634. Here, rather than arranging for a Functional Capacity Evaluation ("FCE") or an in-person IME in order to allay its concerns about Plaintiff's "functionality and suspected employment," Defendant referred Plaintiff's claim to the "Special Investigations Unit" and HUB Enterprises, Inc., another company with whom Defendant had strong financial ties, to conduct an investigation.[69] While the Court recognizes that "there is nothing procedurally improper about the use of surveillance,"[70] an IME or FCE would have yielded to a more complete assessment of Plaintiff's capacity and limitations. *See Salomaa*, 642 F.3d at 676 ("An insurance company may choose to avoid an independent medical examination because of the risk that the physicians it employs may conclude that the claimant is entitled to benefits.") Here, the fact that a video surveillance was conducted in lieu of an IME raises legitimate questions concerning the thoroughness of the investigation. *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005) (holding that the failure to conduct a physical examination may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination). In view of Defendant's conflict of interest, the Court weighs Defendant's refusal to conduct an IME as a factor in determining the degree of skepticism that should be applied to the abuse of discretion standard.

In addition, Plaintiff has proffered evidence showing that Defendant's claims personnel are not completely "walled off" from those personnel who are involved in its financial operations.[71] Bruce Luddy, Defendant's Director of Litigation and Appeals, testified that Hartford's claims reviewers do not interact with those individuals who are interested in the profitability of a particular claim.[72] However, the administrative record in this matter includes a document from Defendant's claim file with a notation regarding the termination of Plaintiff's benefits claim on "02/20/2009" and, immediately next to it, a reference to the "amount of $447,947.00."[73] While Defendant is correct in pointing that it is unclear what this amount represents,[74] this evidence is also a factor that must be considered in determining the degree of skepticism that is appropriate in this case.[75]

Further, Plaintiff also offered other evidence that may be relevant in ascertaining the quantum of skepticism that the Court

---

69. A.R. H1367.

70. *Delta Family–Care Disability & Survivorship Plan v. Marshall*, 258 F.3d 834, 841 (8th Cir.2001).

71. Kantor Decl., Ex. A, Luddy Dep. Tr., 86:9–18.

72. Kantor Decl., Ex. A, Luddy Dep. Tr., 86:14–18.

73. A.R. H1366.

74. Def.'s Responsive Trial Br. at 13.

75. Plaintiff claims that reference to the amount of $447,947.00 in the claim file represents Defendant's financial savings attributable to the termination of Plaintiff's claim, and "its reference in his file can only be viewed as irrefutable evidence as to the actual motivation behind Hartford's claim denial." (Pl.'s Opening Trial. Br. at 20.) While this is *one* way of evaluating the significance of this particular piece of evidence, it is not the *only* conclusion that can be drawn from Defendant's reference to a monetary amount in its claims file.

must use to temper the abuse of discretion standard. However, the Court need not belabor its discussion of the proper standard of review because the evidence highlighted above—i.e., Defendant's financial ties with the vendors who are involved in the claims process; Defendant's refusal to conduct an IME; and the claim file's reference to a certain amount in Plaintiff's claims file—are sufficient for the Court to conclude that Defendant's conflict of interest permeated the entire administrative decision-making process.

■■■■■ Defendant counters that the "level of scrutiny applied to a claim administrator's decision is increased only if Plaintiff demonstrates a *causal relationship* between the structural conflict of interest inherent in an insured plan and the decisions reached." [76] This argument finds no support in *Saffon*, which was relied upon by Defendant.[77] Indeed, in *Metro. Life Ins. Co. v. Glenn*, the Supreme Court clarified that where there is a structural conflict of interest involved in the denial of ERISA benefits, "a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits" and "the significance of the factor will depend upon the circumstances of the particular case." *Glenn*, 554 U.S. at 108, 128 S.Ct. 2343. The Ninth Circuit has also recently clarified the proper standard of review in *Salomaa*:

> Where, as in this case, the plan gives the administrator discretion, and the administrator has a conflict of interest, we are to judge its decision to deny benefits to evaluate whether it is reasonable.... *We must judge the reasonableness of the plan administrator skeptically where, as here, the administrator has a conflict*

*of interests....* The conflict of interest requires additional skepticism because the plan acts as judge in its own cause. *Salomaa*, 642 F.3d at 675 (emphasis added; citation omitted). In view of *Salomaa's* clear mandate, the Court finds that Defendant's argument—that some kind of "causal link" is necessary before the abuse of discretion could be tempered—lacks merit. Therefore, the Court reviews Defendant's denial of benefits for abuse of discretion with enhanced skepticism. *Montour*, 588 F.3d at 631.

**2. The Court Finds in Favor of Plaintiff in Applying the Abuse of Discretion Standard with Enhanced Skepticism**

■■■■■ "[T]he test for abuse of discretion in a factual determination (as opposed to legal error) is whether 'we are left with a definite and firm conviction that a mistake has been committed,' and we may not merely substitute our view for that of the fact finder. To do so, we consider whether application of a correct legal standard was '(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record.'" *Salomaa*, 642 F.3d at 676. For the reasons explained below, the Court finds that Defendant has abused its discretion in terminating Plaintiff's LTD benefits.

Defendant argues that although the Policy grants the administrator the right to request an IME, nothing in the Policy requires the administrator to conduct one. As such, Defendant's argument goes, the administrator acted within its authority when it refused to conduct an in-person IME prior to terminating Plaintiff's benefits. Defendant further explains that an in-person IME will *not* add anything to Plaintiff's case and is unnecessary because

---

**76.** Def.'s Opp'n to Request for a *Nolan* Hearing at 1.

**77.** Def.'s Opp'n to Request for a *Nolan* Hearing at 2.

Plaintiff's cardiac condition is susceptible to objective testing.[78] According to Defendant, Plaintiff's test results, medical records, and activities confirmed that he had recovered sufficiently to return to work prior to Defendant's termination of benefits.[79]

Defendant's conclusion is not supported by sufficient evidence. In Plaintiff's Appeal Letter, dated September 25, 2009, Plaintiff submitted his medical records to support his claim.[80] Among other things, in a note dated April 17, 2008, Dr. Patadia recorded that Plaintiff has an on-going ischemic cardiomyopathy and was experiencing "heaviness of chest" upon merely climbing one flight of stairs.[81] When Plaintiff is fatigued and tired, Plaintiff's symptoms become "more noticeable."[82] Also contained as part of Plaintiff's medical records are results of a myocardial perfusion imaging/stress study, dated May 27, 2008, which was conducted in San Antonio Community Hospital.[83] The stress test confirmed that there were abnormalities and defects in Plaintiff's heart.[84] Dr. Patadia also documented on February 12, 2009, just days before the termination of Plaintiff's benefits, that Plaintiff continued to experience chest tightness "almost everyday if he tries to walk faster or do activity in a hurry" and when Plaintiff is tired, simple everyday activities are accompanied by chest tightness in addition to nausea.[85] Plaintiff also submits that on August 7, 2009, weeks before the denial of Plaintiff's appeal, Dr. Patadia noted that Plaintiff has a "tendency to fall asleep."[86] Dr. Patadia also noted that Plaintiff continues to have ischemic cardiomyopathy, which is being treated with medications.[87] When asked whether Plaintiff "can perform the material and substantial duties of his occupation as a faculty physician, professor, and on-call psychiatrist or any occupation," Dr. Patadia opined that "in view of his severe ischemic cardiomyopathy," from a cardiac viewpoint, Plaintiff "should be considered permanently disabled for above conditions."[88] Dr. Patadia also opined that Plaintiff's "long-term prognosis is not good."[89] When asked to indicate objective evidence in support of his conclusion that Plaintiff should be considered permanently disabled, Dr. Patadia responded, "[i]n view of his limited functional capacity from June 3, 2007 cath (catherization)- showing small distal arteries and EF (ejection fraction), he continues to have fatigue; tiredness, shortness of breath, and nausea in exertion, which limits his functional capacity significantly[,] *so I think he should be permanently disabled.*"[90] (Emphasis added.) Despite its acknowledgment of Dr. Patadia's most recent diagnosis and lingering questions regarding Plaintiff's functionality, Defendant did not exercise its right to conduct an in-person evaluation to verify Dr. Patadia's diagnosis. Instead, Defendant turned to

78. Def.'s Responsive Tr. Br. at 2.

79. Def.'s Responsive Tr. Br. at 2.

80. A.R. H0243–0249.

81. A.R. H0244.

82. A.R. H0244.

83. A.R. H0283.

84. A.R. H0283.

85. A.R. H0246.

86. A.R. H0366.

87. A.R. H0366.

88. A.R. H0367.

89. A.R. H0367.

90. A.R. H0367–68; Pl.'s Opening Tr. Br. at 8.

UDC for further paper review.[91] This response appears to be unreasonable given that ERISA requires a "full and fair" review of every claim. While the Court recognizes that Defendant is not obligated to conduct an in-person IME or FCE, such an examination might be necessary in light of Dr. Patadia's belief, as late as August 2009, that Plaintiff should be considered "permanently disabled." *See Calvert*, 409 F.3d at 295 ("failure to conduct a physical examination-especially where the right to do so is specifically reserved in the plan-may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination."). By not conducting a thorough investigation, Defendant has failed to conduct "a meaningful dialogue" with Plaintiff as required by ERISA. *See Booton*, 110 F.3d at 1463.[92]

Next, Defendant claims that it did not abuse its discretion because it conducted a full investigation of Plaintiff's claim. The Court disagrees. While conceding that Dr. Patadia clearly opined that Plaintiff should be considered "permanently disabled," Defendant counters that Dr. Patadia's statement is conclusory and is inconsistent with the medical records, Plaintiff's activities, and the functional capacity demonstrated in surveillance.[93] The Court

finds this argument unavailing, as Defendant has failed to provide a satisfactory explanation as to why Dr. Patadia's diagnosis is inconsistent with Plaintiff's medical records. Further, reliance on Plaintiff's activities based on the surveillance is highly suspect given that an in-person IME would have yielded to a more thorough and objective result. Moreover, there is a substantial and obvious difference in the stress level associated with doing errands, obtaining a graduate degree, and engaging in local politics on the one hand and working full-time to earn a living on the other. While participating in extracurricular activities, such as doing errands and engaging in intellectual pursuits, may be done at one's leisurely pace, the nature and demands of Plaintiff's occupation as a managing addictionist and physician, irrespective of how this particular occupation is defined by the parties, necessarily expose Plaintiff to numerous stressors that surveillance alone cannot adequately reflect.

Defendant also argues that Plaintiff's cardiac condition is susceptible to objective testing, and it is not obligated to blindly accept Plaintiff's self-reports of chest pains and shortness of breath, especially when those are not supported by objective evi-

---

91. Pl.'s Opening Tr. Br. at 9.

92. Plaintiff argues that Defendant abused its discretion by failing to obtain an appropriate job description outlining the essential duties and physical demands of his occupation. (Pl.'s Responsive Trial Br. at 6.) In establishing the "essential duties" of Plaintiff's occupation, Defendant consulted numerous sources, including the American Medical Association ("AMA"), the American Society of Addiction Medicine ("ASAM"), the Dictionary of Occupational Titles ("DOT"), Loma Linda, and Plaintiff himself. (A.R.H0024, H0845.) Defendant has not erred in considering other sources in addition to Plaintiff's own understanding of his job description. The Policy

states that "**Your Occupation** means Your Occupation as it is recognized in the *general workplace*, that you were routinely performing prior to becoming disabled." (A.R. H1678 (emphasis added).) As such, Defendant's reliance on ASAM, AMA, and DOT's account of an addictionist's job description is reasonable. Plaintiff's argument that his job description should be limited to his own belief of what his occupation entailed is inconsistent with the Policy's clear provision that "Your Occupation does not mean the specific job You are performing for a specific employer or at a specific location." Id.

93. Def.'s Responsive Br. at 4.

dence.[94] However, while both denial letters point to the lack of objective evidence of heart failure,[95] Defendant fails to point to specific parts of the medical record to refute Dr. Patadia's diagnosis. Of equal importance, Defendant had previously determined that Plaintiff was disabled and paid him LTD benefits until February 2009, yet it terminated his benefits thereafter without any showing that Plaintiff's health condition has materially improved. As previously stated, Dr. Patadia, as late as August 2009, advised that Plaintiff should be considered "permanently disabled." [96] Defendant fails to explain adequately why Dr. Patadia's diagnosis was sufficient for it to grant benefits for a time, and yet completely unacceptable once the investigation began.

Therefore, the Court concludes that Defendant abused its discretion by terminating Plaintiff's LTD benefits. If there was a question as to Plaintiff's functionality, ERISA requires Defendant to conduct a "full and fair" review of a denial. 29 U.S.C. § 1133(2), which it failed to do.

### 3. Plaintiff's Cognitive Impairment

■■■ In Plaintiff's letter of appeal, he claims that in addition to his physical limitations, he also suffers from cognitive impairment due to his condition and the medications he is taking.[97] In support of that claim, Plaintiff's wife wrote a letter stating that Plaintiff suffers from "pump brain" symptoms, characterized by forgetfulness, inability to focus or complete mental tasks, and mental sluggishness.[98] Plaintiff claims that this impairment should be taken into consideration in determining whether he could perform the essential duties of his occupation because "[i]f he were to experience pump-brain symptoms while working as a doctor, he could endanger the lives of patients in a moment of loss of focus or memory lapse." [99] There is no dispute that none of the records provided for Defendant's review indicates that Plaintiff sought treatment for these cognitive impairments.[100] For this reason, the Court finds that Defendant did not abuse its discretion denying benefits based on any purported cognitive impairment.[101]

### 4. Remedies

Plaintiff asks the Court to remand the matter for Defendant to conduct full and fair review by (1) obtaining an appropriate job description and (2) conducting an IME. [102] In the alternative, Plaintiff asks the Court to reverse Defendant's decision and find that Plaintiff is entitled to such benefits.[103] Plaintiff also asks that his LTD benefits be reinstated for the period up to the date of the remand pursuant to *Pannebecker v. Liberty Life Assur. Co.*, 542 F.3d 1213, 1221 (9th Cir.2008). Defendant failed to address whether reinstatement of benefits is proper upon remand.

■■■ The Court finds that a reversal is not warranted under these circumstances as Plaintiff has not conclusively established that he continues to be entitled to LTD benefits. As further investigation of Plain-

---

94. Def.'s Responsive Br. at 4.

95. A.R. H0203; H0073.

96. A.R. H0367–368.

97. A.R. H0237A.

98. A.R. H0237A.

99. A.R. H0237A.

100. A.R. H0204.

101. A.R. H0206.

102. Pl.'s Reply Trial Br. at 6.

103. Pl.'s Responsive Trial Br. at 16–17.

tiff's limitations is necessary, the Court finds that a remand is the appropriate remedy. Accordingly, the matter is remanded for further consideration by Defendant following a thorough investigation of Plaintiff's claim.

▇▇▇▇ ERISA benefits may be reinstated if the claimant would have continued receiving benefits absent the administrator's wrongful conduct. *Pannebecker*, 542 F.3d at 1221. If an administrator terminates continuing benefits as a result of wrongful conduct, the claimant should continue receiving benefits until the administrator properly applies the plan's provisions. *Id.* Such is the case here. But for Defendant's erroneous determination that Plaintiff was no longer entitled to benefits, Plaintiff would have continued receiving LTD benefits. Accordingly, reinstatement of the LTD benefits is appropriate.

## VI. CONCLUSION

Based on the above findings of fact and conclusions of law, the Court remands the matter to Defendant for further consideration of Plaintiff's claim to LTD benefits, and reinstates benefits pending such review and reconsideration.

**IT IS SO ORDERED.**