**Vicki MAHER, Plaintiff,**

v.

**AETNA LIFE INSURANCE CO., et al., Defendants.**

**C15-883-TSZ**

United States District Court,
W.D. Washington,
At Seattle.

Signed May 5, 2016

---

Melton L. Crawford, Law Office of Mel Crawford, Seattle, WA, for Plaintiff.

Sarah N. Turner, Brittany F. Stevens, Gordon & Rees LLP, Seattle, WA, for Defendants.

## ORDER

Thomas S. Zilly, United States District Judge

THIS MATTER comes before the Court upon the parties' cross-motions for judgment under Federal Rule of Civil Procedure 52, docket nos. 13 & 16.[1] This action concerns the appeal of the denial of plaintiff Vicki Maher's application for Short Term Disability and Long Term Disability benefits. Having reviewed the Administrative Record and all papers submitted by the parties in favor and in opposition to the motions, the Court enters the following Order.

### Background

Vicki Maher is a 52 year-old woman who began working for Boeing in 2001 performing data entry. AR 1, 6, 691. As an employee of Boeing, Maher participated in its ERISA Plan (the "Plan") which provides both Short Term Disability ("STD") and Long Term Disability ("LTD") benefits. AR 1049. The Plan's Summary Plan Description (the "SPD") defines "disabled" to mean an illness "prevents you from performing the material duties of your own occupation or other appropriate work the company makes available." AR 1148. The LTD standard is the same initially, but

requires that the applicant be prevented from working at "any occupation" after the first 30 months of disability. AR 1147. In addition, an applicant does not receive LTD benefits until 26 weeks after the onset of the disability. AR 1070. This period is referred to as either the "exclusionary period" or the "waiting period." Boeing engaged Aetna to administer its disability programs. AR 1070; 1078.

Maher suffered injuries in a number of car accidents in the 1990s which resulted in chronic headaches and pain. AR 648; 650; 691. She received a spinal fusion surgery in 2009, which provided some relief. AR 691; 994. By January 2014, Maher's pain had increased to the point that she visited Dr. Moffat, her primary care physician. AR 696-97. Dr. Moffat prescribed pain medications and referred Maher to Dr. Price, an orthopedic surgeon. AR 701. Maher applied for STD benefits the next day, AR 143, attaching an Attending Physician Statement completed by Dr. Moffat which stated Maher needed leave from work until April 21, 2014. AR 1047-48.

Aetna granted the application, concluding that Maher met the definition of disability, with benefits to begin February 3, 2014 and running through March 2, 2014. AR 476-77. The grant of benefits specifically noted that Maher needed to submit additional medical evidence in order to receive benefits beyond March 2. *Id.*; *see also* AR 358-59 (internal Aetna notes stating the grant gave Maher time to consult with orthopedic surgeon, i.e., Dr. Price). Maher thereafter met with Dr. Price on February 14, 2014, who in turn referred her to Dr. Nelson, a pain management specialist. AR 702. Dr. Price noted that

---

1. The parties elected to proceed pursuant to Rule 52. *See, e.g., Minton v. Deloitte and Touche USA LLP Plan*, 631 F.Supp.2d 1213, 1218 (N.D.Cal.2009) ("Under Rule 52, the court conducts what is essentially a bench trial on the record, evaluating the persuasiveness of conflicting testimony and deciding which is more likely true.") (citing *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1094–95 (9th Cir.1999)).

pain symptoms had been ongoing for nearly two decades as a result of her earlier car accidents. AR 691. After receiving more information, Aetna extended her disability until March 23, 2014. AR 482. Maher met with Dr. Nelson who noted severe pain, rated as a "10/10." AR 634.

Maher continued seeing Dr. Moffat, who completed an Aetna form that extended Maher's leave until April 18, 2014. AR 1042; 1045. Maher then returned to Dr. Price on March 20, where his colleague PA-C Goble noted pain rated as a "7/10." AR 801-02. Maher's physical therapist, Dr. Mehta, similarly observed "severe pain." AR 994.

The first suggested diagnosis for the pain came on April 10. PA-C Goble observed that Maher presented with some of the hallmark symptoms of Chronic Regional Pain Syndrome ("CRPS") and noted that she "Suspected CRPS." AR 796. Dr. Moffat completed another Attending Physician Statement on April 13, 2014, which noted "probable regional pain syndrome" as one of her diagnoses and concluding that Maher could not work until July 27. AR 1009-10.

On April 16 Aetna wrote to Maher informing her that it was terminating her STD benefits. AR 491. The letter stated that Aetna expected "to see compelling abnormal exams and supportive diagnostics." AR 492. Maher's health did not improve subsequent to the termination of benefits and she stated that her pain medications were not effective. AR 793. Dr. Nelson completed an Attending Physician Statement on June 12, concluding that Maher could perform sedentary work for 1-2 hours per day, 1-2 days per week. AR 903. Dr. Nelson cited "allodynia[2] in cervical axial spine, myofascial banding in upper

traps; CT myelogram..." *Id.* Dr. Nelson completed a subsequent Attending Physician Statement, stating Maher could only work "0-1" hours per day because she was in constant pain. AR 746-47.

Maher was referred to another doctor, this time Dr. Neiman, a rheumatologist.[3] Dr. Neiman first noted a suspected diagnosis of fibromyalgia on July 18 and prescribed prednisone. AR 825. PA-C Goble additionally began taking the suspected diagnosis of CRPS more seriously, writing to Aetna that Maher in fact had CRPS and that Aetna should reconsider its termination of STD benefits. AR 733. Aetna subsequently denied the request for reconsideration. AR 496.

Maher's pain increased over the next few months, culminating with Dr. Nelson completing an Attending Physician Statement in October which concluded that Maher could not sit, stand, or walk for over one hour or reach above her shoulders. AR 332. Dr. Neiman five days later wrote that Maher "has all 18 tender points of fibromyalgia," meaning she met the diagnostic criteria for that disorder. AR 820.

Maher ultimately appealed Aetna's termination of her benefits on November 24, 2014. AR 623-907. In her appeal, Maher included a declaration from Dr. Nelson which affirmatively diagnosed her with CRPS. AR 634-36. Dr. Nelson's declaration addressed each of Aetna's four criteria for CRPS. *Id.* Dr. Neiman submitted a declaration which diagnosed Maher with fibromyalgia, concluding she met the diagnostic criteria. AR 817-18. Their declarations, along with that of Dr. Moffat, declared that Maher was incapable of performing the material duties of her occupation. AR 636; 818; 832.

---

**2.** "Allodynia refers to hypersensitivity, or pain due to stimulus that would not normally be painful. *Aguirre–Millhouse v. Colvin,* 2015 WL 3757423, *4 n. 4 (N.D.Ill. June 15, 2015).

**3.** Rheumatology deals with chronic, intermittent pain affecting joints and connective tissue.

Aetna elected not to conduct a medical examination of Maher, but instead hired two experts to review the paper record. Dr. Polanco, M.D., is an employee of MES Solutions which "performs medical reviews for insurance companies, including Aetna." AR 581. Dr. Polanco reviewed the medical component of Maher's application. Aetna's second expert was Dr. Mendelssohn, Psy.D, who focused on the psychological claims. Neither doctor consulted with Maher's specialists. Dr. Polanco did attempt to speak with Dr. Moffat, but she declined to do so until Dr. Polanco secured a release from Maher allowing her to break privilege. AR 585. Dr. Moffat suggested that he submit questions in writing, but he declined to do so. Instead, Dr. Polanco released his report on February 20, 2015, which concluded that Maher's symptoms were the result of stress "with tensing up of her neck and being terrorized by her neighbor." AR 586. He found that no "clinical examination findings support functional limitations." *Id.* Aetna sent Dr. Polanco's report to Dr. Moffat shortly thereafter, asking her to respond. AR 569. Her assistant, Tami, called Aetna on February 27 and allegedly stated that Dr. Moffat agreed. AR 34.[4]

Dr. Mendelssohn likewise contacted only Dr. Moffat, who stated that she was not treating Maher's mental health. AR 595. Dr. Mendelssohn did not contact Maher's psychiatrist, instead releasing her report which concluded that Maher had no functional impairments. AR 596.

Aetna informed Maher on March 3, 2015, that her appeal had been denied. AR 518-20. The letter cited the lack of "diagnostics" supporting functional limitations and otherwise relied entirely on the reports of Drs. Polanco and Mendelssohn. AR 519. Six days later, the Social Security Administration determined that Maher was totally disabled as of January 24, 2014.

Maher Decl., docket no. 21, Ex. A. Maher subsequently filed this case.

### Analysis

#### A. LTD Benefits are Before the Court

As an initial matter, the Court rejects Aetna's argument that only its denial of STD benefits is properly before the Court in this matter. Maher has consistently sought recovery of LTD benefits from the outset of this case. *See* Compl., docket no. 1, ¶ 6.6 (seeking that the "Court order Defendant to pay Plaintiff the long-term disability benefits she was entitled to receive from July 27, 2014, to the time of trial"); Joint Status Report, docket no. 9, at 2 ("This case involves a dispute over Plaintiff's eligibility for short-term and long-term disability benefits..."); Pl.'s Mot., docket no. 13, at 1 ("Plaintiff Vicki Maher respectfully moves this Court ... to enter judgment declaring her disabled within the meaning of short-term and long-term disability plans..."). In addition, Aetna actually rendered a decision on whether Maher met the criteria for LTD benefits. AR 518 (letter denying STD and LTD appeal dated March 3, 2015). In it, Aetna explicitly stated that LTD benefits were denied. *Id.* Thus, Maher raised her claim for LTD benefits and Aetna denied them. Nothing else is necessary to satisfy the exhaustion requirement. *See Vaught v. Scottsdale Healthcare Corp. Health Plan*, 546 F.3d 620, 626 (9th Cir.2008).

#### B. Standard of Review is De Novo

 The presumptive standard of review for appealing a denial of ERISA benefits is de novo. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). However, if a plan "expressly and unambiguously gives the administrator discretion to determine eligibility," a reviewing court applies an

---

4. Whether Dr. Moffat actually agreed is a

matter of dispute which is discussed *infra.*

abuse of discretion standard. *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 673 (9th Cir.2011). When that standard applies, the central question is whether the decision to deny benefits was reasonable. *Id.* at 675. "[T]he test for abuse of discretion in a factual determination (as opposed to legal error) is whether we are left with a definite and firm conviction that a mistake has been committed." *Id.* at 676 (quoting *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir.2009) (en banc)) (internal quotations omitted). The parties contest the applicable standard of review.

### 1. Short Term Disability

■ Aetna argues that the SPD conveys the necessary discretionary authority it needs to interpret the plan. The SPD provides that the administrator has the "exclusive right, power, and authority, in its sole and absolute discretion, to [a]dminister, apply construe, and interpret the Plan and all related Plan documents." AR 1141. Maher responds that the SPD is not part of the Plan and cannot grant Aetna discretionary authority.

In *CIGNA Corp. v. Amara*, 563 U.S. 421, 131 S.Ct. 1866, 179 L.Ed.2d 843 (2011), the Supreme Court rejected an argument that the SPD contained terms of an ERISA plan. It concluded "that the summary documents, important as they are, provide communication with beneficiaries *about* the plan, but that their statements do not themselves constitute the *terms* of the plan for purposes of § 502(a)(1)(B)." *Id.* at 437, 131 S.Ct. 1866 (emphases in original). Subsequent courts have consistently held that SPDs cannot conflict with plan documents. *See, e.g., Becker v. Williams*, 777 F.3d 1035, 1039 n. 3 (9th Cir.2015); *Mirick v. Prudential Ins. Co. of Am.*, 100 F.Supp.3d 1094, 1097 (W.D.Wash.2015); ERISA Prac. & Litig. § 12:38 (2014) ("Stated succinctly, post-*Amara*, if the plan document and SPD

conflict, the plan document prevails."). Even so, courts have recognized that the traditional dichotomy between a separate "Plan" and SPD is not required. Instead, in some circumstances the same document can be both the SPD *and* the Plan. *See Prichard v. Metropolitan Life Ins. Co.*, 783 F.3d 1166, 1169 (9th Cir.2015) ("Although it would seem peculiar for a document meant to 'apprise' participants of their rights *'under the plan'* to be itself part of the 'plan,' apparently, particularly in the context of health plans, the SPD is sometimes argued to *be* the plan; that is, to serve simultaneously as the governing plan document.") (quoting *Amara*, 563 U.S. at 446, 131 S.Ct. 1866 (Scalia, J., concurring in judgment) (emphases in original)). Similarly, "the Plan" could be diffused throughout a number of documents which make one consolidated whole for purposes of ERISA. *See Bd. of Trs. of Nat. Elevator Indus. Health Ben. Plan v. Montanile*, 593 Fed.Appx. 903, 910 (11th Cir.2014), *rev'd on other grounds*, —— U.S. ——, 136 S.Ct. 651, 193 L.Ed.2d 556 (2016).

Notably, Aetna has failed to demonstrate that this is such a case. The Administrative Record provided by Aetna as part of this appeal contains two documents which could conceivably be Plan documents. The first is the "Disability, Life, and Accident Plans—Summary Plan Description 2009 Edition." AR 1049-1153. The second is a document titled "Non-Union Long Term Disability." AR 1154-1233. Of the two, Aetna argues that the first is both the SPD for the Plan generally and the sole Plan document for STD benefits. From its review of the record, the Court concludes Aetna cannot show that the Plan "expressly and unambiguously" gives Aetna discretion with respect to STD benefits.

The SPD makes a number of references to "the Plan" which strongly suggest that such a document does in fact exist. For

example, the cover of the SPD refers to the "Boeing Company Employee Health and Welfare Benefit Plan (the 'Plan')." AR 1049. On the very next page, the SPD states that "[i]f there is any conflict between the information in this booklet and the official Plan document, the official Plan document will govern." AR 1050. The SPD finally describes the "Plan Document" as "The Boeing Company Master Welfare Plan." AR 1143. In light of the frequent references to the existence of a separate "Plan Document" as well as a provision contemplating a disagreement between the SPD and Plan Document, the Court cannot conclude that the SPD *is* the Plan Document. The SPD does not grant discretionary authority to Aetna in administering STD benefits. Review of the denial of STD benefits will be de novo.

2. Long-Term Disability

■ The Administrative Record does, however, contain the LTD policy which includes a provision granting Aetna discretionary authority. The policy reads:

> Aetna is a fiduciary with complete authority to review all denied claims for benefits under this policy. In exercising such fiduciary responsibility, Aetna shall have discretionary authority to: determine whether and to what extent employees and beneficiaries are entitled to benefits; and construe any disputed or doubtful terms of this policy.

AR 1212. Maher contends that the Washington Administrative Code has banned these sorts of grants of discretionary authority in insurance policies. *See* WAC 284–96–012(1). Enacted in 2009, WAC 284–96–012(1) provides that "No disability insurance policy may contain a discretionary clause," meaning "a provision that pur-

ports to reserve discretion to an insurer, its agents, officers, or designee in interpreting the terms of a policy or deciding eligibility for benefits." The section explicitly states its purpose as avoiding a result where "deference must be given to the insurer's interpretation of the contract or claim decision." WAC 284–96–012(1)(e).

Though little discussed in Washington cases, courts in this district have uniformly applied the provision to invalidate grants of authority in insurance policies. *See, e.g., Mirick*, 100 F.Supp.3d 1094; *Bourland v. Hartford Life & Acc. Ins. Co.*, 2014 WL 4748218 (W.D.Wash. Sept. 24, 2014); *Landree v. Prudential Ins. Co. of Am.*, 833 F.Supp.2d 1266, 1268 (W.D.Wash.2011). Because Aetna pays LTD benefits for Boeing, the WAC provision applies and review is de novo.[5]

## C. De Novo Analysis

■ The Court concludes the overwhelming weight of medical evidence supports a finding that Maher is disabled for purposes of STD and LTD benefits. Every doctor who examined Maher observed significant pain and offered no reason to believe her to be anything less than fully credible. These doctors offered a bevy of medical evidence which painted a stark picture of Maher's functional limitations. For example, Dr. Nelson offered a declaration which diagnosed Maher with CRPS and concluded that due to "her chronic and severe pain, her fatigue and exhaustion, her cognitive fog, and her inability to use a computer for more than 5-10 minutes at a time due to pain, Ms. Maher is presently unable to perform the material and substantial duties of her occupation." AR 636. Drs. Moffat and Neiman similarly offered declarations which conclude Maher was in-

---

**5.** The Court declines to address whether WAC 284–96–012 would invalidate self-funded disability programs like that of Boeing's STD.

capable of working at her job. AR 818; 832. In addition, Maher later received an award of SSDI benefits which, although not binding upon the Court, is evidence weighing in favor of her meeting the Plan's definition of disability. *See, e.g., Bledsoe v. Metropolitan Life Ins.*, 90 F.Supp.3d 901, 917 (C.D.Cal.2015) (noting that an "SSDI award does help Plaintiff's showing that she is disabled"). Simply put, the evidence uniformly shows that Maher was disabled as of January 2014.

### D. Abuse of Discretion Review

■ The Court also concludes that even if Aetna had discretionary authority for either the STD or LTD benefits, that Aetna abused its discretion in denying them. In reviewing under this standard, the Court considers all relevant factors. *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 968 (9th Cir.2006). "A district court, when faced with all the facts and circumstances, must decide in each case how much or how little to credit the plan administrator's reason for denying insurance coverage." *Id.* Aetna's interpretation of the plan will not be disturbed so long as it is "reasonable." *Salomaa*, 642 F.3d at 675. However, if the plan administrator has a conflict of interest the Court reviews "with additional skepticism because the plan acts as judge in its own cause." *Id.*

#### 1. Conflict of Interest

Maher argues that Aetna has a structural conflict of interest in evaluating disability claims because it both determines LTD eligibility and pays out the resulting benefits. In *Firestone*, the Supreme Court determined that if an administrator operates under a conflict of interest, the conflict "must be weighed as a factor in determining whether there is an abuse of discretion." *Firestone*, 489 U.S. at 115, 109 S.Ct. 948. Later expanding on that concept, the Supreme Court concluded that it was a conflict of interest for the same entity to both fund a plan and evaluate claims for benefits under it. *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 112, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008). In such circumstances, the insurer "has an incentive to pay as little in benefits as possible to plan participants because the less money the insurer pays out, the more money it retains in its own coffers." *Abatie*, 458 F.3d at 966.

Aetna responds that it has no responsibility for the payment of STD benefits and thus no structural conflict can exist. As for LTD benefits, Aetna argues that its denial was "procedural," insofar as the denial was based on Maher not having been disabled for a sufficiently long period.

The Court concludes that Aetna operated under a conflict of interest in determining both the STD and LTD applications. Aetna's position with respect to the "procedural" nature of the LTD denial is puzzling, given that Aetna readily admits that the "procedural ground" was that it did not believe Maher to have been disabled as of January 27, 2014. *See* Defs.' Reply, docket no. 23, at 5 (agreeing there is no requirement to have been on STD to receive LTD benefits). Given that the core issue of this case is whether Maher was disabled at that date, describing Aetna's denial as not being a substantive analysis of her condition makes no sense. Aetna had a conflict of interest in reviewing the LTD benefits.

■ The Court similarly concludes Aetna operated under a conflict of interest for the STD benefits in light of the joint nature of the disability application. Aetna is correct that normally there cannot be a conflict of interest unless the insurer both evaluates claims and pays benefits for any claims upheld. However, the STD and LTD benefits are inextricably intertwined in this case. Aetna evaluates both STD and the first 24 months of LTD benefits under

the same "own occupation" standard. *See* AR 1147-48. Aetna had an incentive to deny STD benefits because it would be logically difficult for Aetna to simultaneously grant one but not the other. *See Rodas v. Standard Ins. Co.*, 2015 WL 4477787, *3 (C.D.Cal. July 10, 2015) (reasoning that an insurer had "an obvious stake in the decision to deny or grant" initial benefits not funded by insurer where insurer did fund a different period of benefits). Aetna operated under a functional conflict of interest and the Court accordingly reviews with "additional skepticism." *Salomaa*, 642 F.3d at 675.

### 2. Aetna's Revocation of STD

Maher contends that Aetna's decision further "warrants substantial skepticism" because Aetna initially granted her STD application before ultimately terminating the benefits less than three months later without evidence of improvement. However, the line of authority Maher draws from is distinguishable in that the insurers in those cases had been paying benefits for an extended period of time before abruptly terminating them. *See, e.g., Bertelsen v. Hartford Life Ins. Co.*, 1 F.Supp.3d 1060, 1073 (E.D.Cal.2014) (insurer paid benefits for three years before issuing letter revoking benefits without explanation); *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 871 (9th Cir.2008) ("After all, MetLife had been paying Saffon long-term disability benefits for a year, which suggests that she was already disabled. In order to find her no longer disabled, one would expect the MRIs to show an *improvement*, not a lack of degeneration.") (emphasis in original).

■■■■ Aetna's initial grant of STD benefits made clear that those benefits were meant only to be a stopgap until Maher was able to provide additional medical evidence as to her disability. *See* AR 476-77. In its letter, Aetna directed Maher to supply medical evidence which would provide Aetna "with a clear understanding of how your disability continues to affect your work capacity." AR 477; *see also* AR 361 (Aetna certified STD benefits to allow Maher to "complete additional consults w/ neuro, pain management and test (mri) [sic]"). Aetna's initial grant was based primarily on the exam and Attending Physician Statement of Dr. Moffat, Maher's general practitioner, who in turn relied heavily on subjective reports from Maher. AR 476. Aetna thus acted reasonably by initially granting benefits in a case which might be meritorious and then terminated them once a fuller medical picture was submitted.[6] Requiring some heightened burden to terminate benefits in such circumstance would disincentivize administrators from making initial grants to many people who desperately rely on disability payments. *See Ellis v. Liberty Life Assur. Co. of Boston*, 394 F.3d 262, 273 (5th Cir. 2004) (determining such a rule "would have a chilling effect on the promptness of granting initial benefits in the first place").

### 3. Misrepresentation of Dr. Moffat's Opinions

■■■■ Maher next argues that Aetna misrepresented the opinions of Dr. Moffat in order to support its decision to deny Maher's appeal. Dr. Moffat filled out an Attending Physician Statement which formed the backbone of Maher's initial STD application. *See* AR 1047-48. Dr. Moffat concluded that Maher had "no ability to work currently" due primarily to pain. *Id.* Dr. Moffat saw Maher numerous times throughout this process, consistently concluding that she was incapable of working. *See, e.g.*, AR 1042 (March 17, 2014 Attend-

---

**6.** To the extent Maher's real challenge is to the adequacy of the reasoning of the termination, rather than the termination *per se,* the Court addresses that issue *infra.*

ing Physician Statement). Maher's final administrative appeal included a declaration by Dr. Moffat which stated that Maher "remains unable to perform the material duties of her occupation." AR 832-33.

Despite Dr. Moffat's consistent opinion that Maher was not able to work, Aetna's final denial of Maher's appeal stated that "Dr. Moffat agrees with the occupational medicine physician reviewer's assessment," referring to Dr. Polanco who concluded there was no support for any functional limitations. AR 519 (letter denying appeal); AR 581-87 (Polanco report). How Aetna reached this conclusion is somewhat tortured. It appears that Dr. Polanco sought to receive Dr. Moffat's input on his report, but Dr. Moffat refused to break privilege without a written waiver by Maher. AR 585 (detailing Dr. Polanco's attempts at contact). Eventually Dr. Polanco submitted two written questions, at Dr. Moffat's suggestion. *Id.* Dr. Moffat's assistant Tami thereafter called Aetna and allegedly stated that Dr. Moffat "agrees." AR 452.

■■■ The Court concludes that it was unreasonable for Aetna to have relied on Dr. Moffat's "agreement" with Dr. Polanco's conclusion that there was no support for Maher's functional limitations. Maher has submitted a brief declaration of Dr. Moffat which clarifies that her "agreement" was solely that her "records do not contain objective clinical evidence of Ms. Maher's syndrome," but that she "has no reason to doubt her symptom report and stand[s] by prior statements regarding her ability to perform her own occupation at Boeing." Crawford Decl., docket no. 14, Ex. 1.[7] However, even beyond Aetna's mis-

interpretation of Dr. Moffat's assistant's truncated relaying of Dr. Moffat's opinion, it was unreasonable for Aetna to conclude that Dr. Moffat would suddenly engage in a wholesale reversal of her consistent opinion. The limited nature of contact between Aetna and Dr. Moffat was insufficient for Aetna to conclude that Dr. Moffat had reversed her position. Accordingly, the Court weighs Aetna's reliance on Dr. Moffat as a factor for a finding that Aetna abused its discretion.

### 4. Aetna's Demand for Objective Proof of Disability

Maher also argues that Aetna improperly required objective proof of her disability as a condition to receiving disability benefits. She contends that Aetna is demanding objective proof of pain, an inherently subjective phenomenon. Aetna counters that in light of objectively normal test results and "questions about the diagnosis of CRPS," it was reasonable to require some objectively verifiable manifestation of disability to accompany the self-reported pain. With respect to medical limitations, Aetna's final denial relied primarily on Dr. Polanco in concluding that there are no "clinical examination findings support[ing] functional limitations." AR 519.

■■■ The Ninth Circuit has observed that pain "is a completely subjective phenomenon and cannot be objectively verified or measured." *Saffon*, 522 F.3d at 873 (quoting *Fair v. Bowen*, 885 F.2d 597, 601 (9th Cir.1989) (internal quotations omitted)). Accordingly, "conditioning an award on the existence of evidence that cannot exist is arbitrary and capricious."

7. The normal rule in ERISA appeals is that the Court can consider only evidence that was before the administrator. However, because Aetna's reliance on the statement by Dr. Moffat's assistant took place for the first time in the final administrative decision, Maher is entitled to respond in this forum. *Gabriel v.*

*Alaska Elec. Pension Fund*, 773 F.3d 945, 964 (9th Cir.2014) ("Where the administrator's final denial contains a new rationale for denying a claim, the participant may present evidence on that point to the district court, which must consider it."). Thus, defendants' motion to strike, docket no. 23, is DENIED.

*Salomaa*, 642 F.3d at 678. Acknowledging the risk of false claims based on chronic pain and fibromyalgia, the Ninth Circuit still concluded that where a disability policy does not contain an exclusion for those conditions, the insurer "has taken on the risk of false claims for th[ese] difficult to diagnose condition[s]." *See id.* Thus, a "plan's denial is arbitrary to the extent that it was based on [a consulting physician's] implicit rejection of [a] Plaintiff's subjective complaints of pain." *James v. AT & T W. Disability Benefits Program*, 41 F.Supp.3d 849, 879–80 (N.D.Cal.2014) (internal quotations omitted).

▬▬ What Aetna *can* condition benefits upon is evidence that the pain has the effect of preventing Maher from working. *See, e.g., Taylor v. Reliance Standard Life Ins. Co.*, 837 F.Supp.2d 1194, 1208 (W.D.Wash.2011) ("[Insurer] did not abuse its discretion in requiring [claimant] to submit evidence that his subjective complaints were severe enough to prevent him from performing his occupation."). Put another way, Aetna cannot demand objective evidence that Maher has pain, but it can insist on evidence as to what degree of function she has as a result of the pain. As to the latter, Dr. Polanco's report concludes that there "are no cognitive or medication side effects affecting functionality..." AR 586. This statement belies the record. Instead, the record is replete with references to functional impairments noted by Maher's doctors. As a sample, the Court notes that Dr. Neiman noted "anxiety, sleepiness, mental cloudiness, sleep problems, and headaches," AR 599; Dr. Nelson marked down "mental cloudiness from the medication, sleep problems, new

pain, anxiety, swelling, itching, and headache," AR 789; Ms. Goble noted "mental cloudiness, sleep problems and headache," AR 793; and Dr. Price stated that Maher's symptoms are worse when sitting, standing, driving, or using a computer. AR 691. Not only did Maher's doctors note these types of symptoms, they often put them in terms of limitations of Maher's ability to work. For example, Dr. Nelson concluded Maher could only work 1-2 hours a day, 1-2 days per week as of April 2014. AR 903.

In order to assist Aetna in interpreting their records, Drs. Moffat, Neiman, and Nelson submitted declarations summarizing their treatments. Each concluded that she was incapable of working due to her functional limitations that resulted from her pain. AR 636; 818; 832. Dr. Polanco wholly fails to explain why he disagrees with their findings, mostly failing even to address them at all. As a prime example, the Court is troubled by Dr. Polanco's summary rejection of Dr. Nelson's diagnosis of CRPS. Aetna previously published a "Clinical Policy Bulletin" (the "Bulletin") on CRPS,[8] which opens by noting that CRPS is "one of the major causes of disability." AR 637. The Bulletin lists four criteria necessary for a diagnosis of CRPS. AR 638. Dr. Nelson's declaration addresses each criterion that Aetna itself believes warrants a diagnosis. AR 634. Yet, Dr. Polanco's report makes no mention to Dr. Nelson's diagnosis.

▬▬ Aetna was certainly entitled to rely on a consulting expert as opposed to conducting an in-person examination of Maher.[9] However, it is an abuse of discretion for Aetna to rely on Dr. Polanco

---

**8.** The Bulletin uses the alternative name of "Reflex Sympathetic Dystrophy." AR 637.

**9.** Although Aetna may elect to proceed without an in-person examination of an applicant, in certain circumstances it raises "questions

about the thoroughness and accuracy of the benefits determination." *Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623, 634 (9th Cir.2009) (quoting *Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 554 (6th Cir. 2008)).

where he, at best, conclusorily rejects the findings of the doctors who actually examined her. *See Evans v. UnumProvident Corp.*, 434 F.3d 866, 878–79 (6th Cir.2006) (criticizing "the independent expert's conclusory assertions" which "failed to rebut the contrary conclusions of the physicians who conducted regular physical examinations"); *Sanderson v. Cont'l Cas. Corp.*, 279 F.Supp.2d 466, 474 (D.Del.2003) ("[A]s [insurer's expert] did not examine Sanderson personally, the court finds it suspect that Continental would have so easily accepted his report over the findings of Sanderson's treating physicians, and her own, albeit subjective complaints of pain."). Aetna was entitled to credit its reviewing experts' opinions, but only if those opinions properly addressed the evidence. The Court concludes that Aetna's failure to properly address countervailing evidence is a factor weighing in favor of a finding that Aetna abused its discretion.[10]

### 5. Weighing the Factors

In light of the foregoing issues, the Court concludes that Aetna abused its discretion in denying Maher's STD and LTD benefits. Aetna operated under a structural conflict of interest with respect to LTD benefits and a functional one for STD benefits due to the identical standards. Dr. Moffat's consistent opinion that Maher's pain prevented her from working was, through a wholly inadequate process of missed phone calls and an assistant talking to a claims representative, converted into evidence against Maher. And most troublingly, Aetna failed to appropriately (if at all) respond to the weight of the evidence Maher provided as to her limitations. The Court concludes that Aetna's determination of her application was not "reason-

able," *Salomaa*, 642 F.3d at 675, and thus must be reversed.

### E. Remedy

■■■ Although only briefly addressed in the papers, the parties also dispute the appropriate remedy that should follow the Court's reversal of the STD and LTD determinations. The parties agree that the Court should order payment of STD benefits. However, Aetna argues that it must have an opportunity to analyze Maher's health as it stands currently in order to determine whether she warrants LTD benefits under the "own occupation" standard applicable to the first 30 months of disability. *See* AR 1147. The Court disagrees. The Ninth Circuit has explained that retroactive reinstatement of benefits is proper where an administrator applies the right standard but reaches the wrong conclusion. *Grosz–Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1163 (9th Cir.2001) ("[A] plan administrator will not get a second bite at the apple when its first decision was simply contrary to the facts."). Because Maher has not applied for LTD benefits under the "any occupation" standard, the Court leaves that issue to Aetna, should it arise. *See Rodden v. Jefferson Pilot Fin. Ins. Co.*, 591 F.Supp.2d 1113, 1126–27 (N.D.Cal.2008) (reinstating for "regular occupation" benefits but remanding for "any occupation" benefits).

### *Conclusion*

For the foregoing reasons, the Court GRANTS plaintiff's Motion for Judgment Under Rule 52, docket no. 13, and DENIES defendants' Motion for Judgment Under Rule 52, docket no. 16. Plaintiff was disabled within the meaning of the Plan and entitled to receive STD benefits from

---

**10.** The Court assigns no error to Aetna's reliance on Dr. Mendelssohn. Maher has only argued that in other cases courts have taken issue with Dr. Mendelssohn's analysis, but she has not argued that Dr. Mendelssohn's review in this case was flawed.

March 24, 2014, until July 28, 2014. She has been disabled under the Plan for purposes of LTD benefits and entitled to receive LTD benefits from July 29, 2014, through the date of judgment. Plaintiff is also entitled to recover prejudgment interest on unpaid interest. Any motion for attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g)(1) shall be filed no later than 14 days from the date of this Order and shall be noted in accordance with the Local Rule 7. Plaintiff is DIRECTED to submit a proposed form of judgment within 14 days from the date of this Order. Defendants shall file any objections to the proposed form of judgment within seven days of its submission.

IT IS SO ORDERED.